unsealed 7/22/10

~~SECRET~~

2010 JUL -9 PM 2:52

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

February 2009 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **'10 CR 2742 BEN** |
| Plaintiff, | **I N D I C T M E N T** |
| v. | Title 18, U.S.C., Sec. 1349 - Health Care Fraud Conspiracy; |
| KAREN KAGRAMANIAN (1), DANIEL BAIANDOURIAN (2), STANLEY SIOZON GARRIDO (3), CORAZON FERRER (4), | Title 18, U.S.C., Sec. 1347 - Heath Care Fraud; Title 18, 42 U.S.C., Secs. 1320a-7b(b)(2)(A) - Kickbacks; Title 18, U.S.C., Sec. 2 - Aiding and Abetting; Title 18, U.S.C., Sec. 982(a)(7) - Criminal Forfeiture Allegations |
| Defendants. | |

The grand jury charges:

**INTRODUCTORY ALLEGATIONS COMMON TO ALL COUNTS**

At all times relevant to this Indictment:

**THE MEDICARE PROGRAM**

1. The Medicare Program ("Medicare") was established by the Social Security Act and provided insurance coverage for individuals who are over 65 and for people under the age of 65 who had certain disabilities. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), an agency of the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were often referred to as Medicare "beneficiaries."

LAC:WMC:kot:San Diego
2/11/10

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. Medicare consisted of multiple parts. Medicare Part A covered institutional health costs for hospitals, skilled nursing facilities and home health agencies. Medicare Part B was a federally subsidized voluntary insurance program that paid a portion (typically 80%) of the cost of certain health services not covered by Medicare Part A. The portion of the cost that Medicare did not pay (typically 20%) was a co-payment amount that was the responsibility of the Medicare beneficiary. Eligible Medicare beneficiaries could enroll in Medicare Part B by paying monthly premiums.

4. Medicare's Part B program was administered by private insurance companies who processed and paid Medicare claims. Insurance companies that process Medicare claims were called "carriers." The carrier for the region that included Southern California was National Heritage Insurance Company (NHIC).

**MEDICARE BILLING PROCEDURES**

5. Health care providers that desired to treat Medicare beneficiaries had to apply to Medicare for a provider number. Upon receipt of a provider number, the provider could submit claims directly to Medicare.

6. When bills were submitted to Medicare for services rendered by a medical service provider, the services were identified by a number known as the Current Procedural Terminology ("CPT") code. The CPT was a coding system created by the American Medical Association to enable physicians and others to identify particular medical procedures with precision.

//

<mark>2</mark>

7. Medicare approved providers could submit Medicare claims on paper or electronically. Medicare required that claims contain the following: the beneficiary's name; the beneficiary's health insurance claim number; the date of service; the diagnosis code; and the service that was provided, identified by a CPT code number. To receive reimbursement from Medicare, providers submitted or caused the submission of claims to Medicare for payment of services to beneficiaries, either directly or through a billing company.

8. Before a provider could submit claims electronically, the provider must have submitted an Electronic Data Interchange Enrollment form ("EDI form"). On the EDI form, the provider must have certified that: (a) it would submit claims only for Medicare beneficiaries who have given written authorization to do so, and that the signed authorization was on file; (b) it would submit only claims that "are accurate, complete and truthful"; (c) "it will be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents"; and (d) it was aware that "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to [its claim]. . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

9. Medicare would only reimburse providers for services that were medically necessary. Services and procedures that were not medically necessary, or were not required to treat a specific diagnosis, were not reimbursable under Medicare.

//
//
//

10. The Medicare part B program did not separately cover outpatient massage therapy services. The Medicare part B program did, however, cover certain outpatient physical therapy services. See 42 C.F.R. § 410.60. Physical therapy services that were rendered incident to a physician's primary care could only be reimbursable if they were an integral, though incidental, part of the overall care provided to a patient. 42 C.F.R. § 410.26(b)(2). Although services rendered by auxiliary personnel could be reimbursable, the physician must have provided direct supervision over the administration of the services. 42 C.F.R. § 410.26(a)(2). In the office setting, direct supervision meant that the "physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. § 410.32(b)(3)(ii).

To be reimbursed for physical therapy services: (1) the patient must have been under the care of a physician, see 42 C.F.R. § 410.60(a)(1); (2) the services must have been furnished under a plan of care outlining the type, amount, frequency and duration of the therapy, see 42 C.F.R. § 410.61(c), which plan of care must have included, at a minimum, the patient's significant medical history, diagnosis, physician order, therapy goals, contraindication, and the patient's understanding of the need for treatment and intended goals, see 42 C.F.R. § 424.24(c); and (3) the plan of care must have been certified or recertified by the physician periodically. See 42 C.F.R. § 424.24(c). Absent satisfying each of these requirements, Medicare would not cover outpatient physical therapy services.

//
//

11.  Healthcare providers may bill Medicare Part B for the services of a physician's assistant in one of two ways.  The amount of reimbursement is dependent on the billing method.  Physician assistant services may be billed as services "incident to the service of a physician."  42 C.F.R. §§ 410.10, 410.26.  To be correctly billed in this manner, the physician assistant or nurse practitioner services must have been provided under certain circumstances described at 42 C.F.R. § 410.26.  When physician assistant services are billed as "incident to the services of a physician," the physician's Unique Provider Identification Number (UPIN) is used on the bill submitted to Medicare.  Alternatively, a provider may bill Medicare for physician assistant services under the physician assistant's own UPIN.  Billing Medicare in this second way indicates that the physician assistant has performed the service under some level of supervision by a physician, but the requirements of 42 C.F.R. § 410.26 have not necessarily been met.  For services billed under the physician assistant's UPIN, Medicare pays only a percentage of what it would pay for the same services billed under a physician's UPIN.  42 C.F.R. §§ 405.520(a), 414.52, 414.56.

**THE DEFENDANTS**

12.  Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN were the co-founders of a store-front medical office clinic ("the clinic") located at 5700 El Cajon Boulevard, San Diego, California 92115-3752 that was registered to do business under the name of a medical doctor.  From December 2005 through June 2006, defendants KAREN KAGRAMANIAN and DANIEL BAINDOURIAN operated the clinic at this address.  Medicare was billed by this clinic for services and treatments purportedly rendered to individuals visiting the clinic who were Medicare beneficiaries.

13. At all times material to this Indictment, defendants KAREN KAGRAMANAIAN and DANIEL BAINDOURIAN used the name and Medicare billing information of a medical doctor in connection with the clinic located at 5700 El Cajon Boulevard, San Diego, California 92115-3752. In fact, the medical doctor neither saw patients at the clinic nor was he on the premises to supervise employees during business hours when patients were seen at the clinic.

14. Defendant STANLEY SIOZON GARRIDO was a Physician's Assistant employed by the clinic located at 5700 El Cajon Boulevard, San Diego, California 92115-3752. From in or about January 2006 through June 2006, defendant STANLEY SIOZIN GARRIDO saw patients at this clinic and ordered and performed medically unnecessary tests and procedures on patients.

15. Defendant CORAZON FERRER served as a lead recruiter or "capper" for the clinic located at 5700 El Cajon Boulevard, San Diego, California 92115-3752 from in or about December 2005 through June 2006. Defendant CORAZON FERRER was paid to recruit patients to come to the clinic and was given money to pass along to other cappers and to patients who would, in turn, provide their Medicare beneficiary cards and submit to unnecessary medical procedures at the clinic.

### Count 1
### Health Care Fraud Conspiracy
### (18 U.S.C. § 1349)

16. Paragraphs 1 through 15 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

//
//
//

## OBJECT OF THE CONSPIRACY

17. Beginning in or around August 2005, and continuing through in or about June 2006, within the Southern District of California, and elsewhere, defendants KAREN KAGRAMANIAN, DANIEL BAIANDOURIAN, STANLEY SIOZON GARRIDO, and CORAZON FERRER, and others known and unknown to the grand jury, knowingly and willfully combined, conspired, confederated and agreed with each other to violate Title 18, United States Code, Section 1347, that is to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care program, in connection with the delivery of and payment for health care benefits, items, and services.

## PURPOSE OF THE CONSPIRACY

18. It was a purpose of the conspiracy for defendants KAREN KAGRAMANIAN, DANIEL BAIANDOURIAN, STANLEY SIOZON GARRIDO and CORAZON FERRER, and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting false and fraudulent claims to Medicare; (b) offering and paying kickbacks to cappers and to Medicare beneficiaries for the purpose of inducing such beneficiaries to visit the clinic and allowing their Medicare beneficiary number to be used by the defendants to file fraudulent claims, including claims for medical services not rendered and medically unnecessary; and (c) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds from the fraud.

**MANNER AND MEANS OF THE CONSPIRACY**

19. In furtherance of this conspiracy, and to effect and accomplish the object and purpose of the conspiracy, defendants used the following manner and means, among others:

   a. Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN rented space for a store-front medical clinic at 5700 El Cajon Boulevard in San Diego, California.

   b. Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN opened and operated this clinic to carry out their scheme to bill Medicare for tests and treatments that were not performed, not medically necessary, and not properly performed and supervised by a medical doctor.

   c. Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN sought out and entered into an arrangement with a physician who was to have no role in running the clinic or treating patients but, instead, was employed solely for the purposes of using his name and Medicare billing number to bill false and fraudulent claims to the Medicare program.

   d. Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN paid, directly and indirectly, individuals known as "cappers" or "recruiters" improper inducements and kickbacks to recruit patients with Medicare coverage to come to the clinic, provide their Medicare beneficiary cards and submit to unnecessary medical tests and procedures.

   e. The cappers, including defendant CORAZON FERRER, provided improper inducements, in the form of cash and other consideration to patients, so that the patients would visit the clinic and submit to medically unnecessary medical tests and procedures.

    f.    Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN directed employees of the clinic to perform medically unnecessary tests and procedures on patients that visited the clinic.

    g.    Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN entered into an arrangement with a part-time Physician's Assistant to aid in carrying out the scheme to defraud; the Physician's Assistant, defendant STANLEY SIOZIN GARRIDO, was responsible for seeing the patients, prescribing medically unnecessary tests and procedures, and, in turn, documenting those medically unnecessary tests and procedures in the clinic medical records.

    h.    Defendant STANLEY SIOZIN GARRIDO falsely held himself out as a medical doctor to patients who visited the clinic.

    i.    As part of their scheme, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN employed a massage therapist at the clinic and, knowing that Medicare did not pay for massages and that the clinic's massage therapist was not qualified to administer physical therapy, defendant STANLEY SIOZIN GARRIDO prescribed "physical therapy" for patients then had the massage therapist give patients massages, and, in turn, had the massages falsely billed to Medicare as physical therapy, although Medicare reimbursable physical therapy was not performed.

    j.    Defendants KAREN KAGRAMANIAN, DANIEL BAIANDOURIAN and STANLEY SIOZIN GARRIDO billed or caused to be billed, through a third party billing company, the false and fraudulent claims for physical therapy services that were not rendered and the medically unnecessary tests and procedures that were performed.

//
//

k. Defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN instructed clinic employees to screen beneficiaries proposed by the cappers against a list or database to determine whether Medicare would deny the claims because of excessive claims already made against the beneficiaries' unique beneficiary number ("HIC number").

l. Defendants KAREN KAGRAMANIAN and DANIEL BAINDOURIAN continued to operate this clinic from January 2006 through June 2006 when the clinic stopped seeing patients. These defendants and their co-conspirators billed, or caused to be billed, false and fraudulent claims to Medicare for services not rendered and for medically unnecessary tests and procedures.

m. Between January 1, 2006 and the end of June 2006, defendants KAREN KAGRAMANIAN, DANIEL BAIANDOURIAN and STANLEY SIOZON GARRIDO reported and caused others to report false and fraudulent information on claims to Medicare regarding the identity of the person performing the services for which claims were being submitted. Such false and fraudulent information included, but was not limited to routinely reporting that services had been performed by a physician when, in truth and fact, the services had been performed by a lesser trained and lower paid physician's assistant, who should have been identified as the provider of medical services and whose services, if covered, often would have been reimbursable at a lower rate than for a physician.

//
//
//
//
//

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants KAREN KAGRAMANIAN, DANIEL BAINDOURIAN, STANLEY SIOZIN GARRIDO and CORAZON FERRER, and others known and unknown to the grand jury, aided and abetted, committed, and willfully caused others to commit, within the Southern District of California and elsewhere, the following overt acts:

1. In or about the summer of 2005, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN rented space for the storefront medical office clinic located at 5700 El Cajon Boulevard in San Diego, California, within the Southern District of California.

2. Between the summer of 2005 and early January 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN recruited a 79-year old retired physician for the purpose of using his name and Medicare billing number to set up the store-front clinic.

3. In or about January 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN recruited a part-time Physician's Assistant, defendant STANLEY SIOZIN GARRIDO, to assist them in carrying out the scheme to defraud.

4. Between December 1, 2005 and the end of June 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN paid individuals known as "cappers" or "recruiters", including defendant CORAZON FERRER, to recruit patients with Medicare coverage and beneficiary cards to the store-front clinic.

//
//
//
//

5.  Between January 1, 2006 and the end of June 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN instructed clinic employees to screen beneficiaries proposed by the cappers against a list or database identifying beneficiaries whose claims, the defendants believed, Medicare would deny because of excessive claims already made against the beneficiaries' unique beneficiary number ("HIC number").

6.  In February 2006, consistent with the direction of defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN, a clinic employee told patient YT that any claim by the clinic for services rendered her would be denied by Medicare because of excessive claims already made against her HIC number and that, therefore, she would not receive services or treatment at the clinic.

7.  Between the summer of 2005 and the end of January 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN instructed the medical doctor that his role was not to see or treat patients nor to be onsite at the clinic but rather to periodically review medical charts on a retrospective basis and to sign off on what was done by the Physician's Assistant, who was seeing patients at the clinic.

8.  Between January 1, 2006 and the end of June 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN instructed employees of the store-front clinic to administer medically unnecessary tests and procedures to patients at the clinic.

9.  Between January 1, 2006 and the end of June 2006, defendants KAREN KAGRAMANIAN, DANIEL BAIANDOURIAN and STANLEY SIOZIN GARRIDO submitted or caused the submission of claims for Medicare reimbursement for physical therapy purportedly

//

administered to patients of the clinic knowing that patients did not receive Medicare reimbursable physical therapy at the clinic.

10. Between January 1, 2006 and the end of June 2006, defendant STANLEY SIOZIN GARRIDO prescribed physical therapy for clinic patients knowing that such therapy was not medically necessary and that, in any event, the clinic would provide patients with only a massage and not physical therapy.

11. Between January 1, 2006 and the end of June 2006, defendant STANLEY SIOZIN GARRIDO prescribed medically unnecessary tests and procedures for each of the patients at the clinic.

12. Between January 1, 2006 and the end of June 2006, defendant STANLEY SIOZIN GARRIDO prepared patient charts as part of an effort to justify the multitude of medically unnecessary tests and procedures conducted on patients and to hide the lack of medical necessity for these tests and procedures.

13. Between January 1, 2006 and the end of June 2006, defendants KAREN KAGRAMANIAN and DANIEL BAIANDOURIAN employed a massage therapist at the clinic knowing that the massage therapist was not qualified to and did not administer Medicare reimbursable physical therapy.

14. Between January 1, 2006 and the end of June 2006, defendant STANLEY SIOZIN GARRIDO routinely prescribed nerve conduction velocity (NCV) tests on patients knowing that this test was not medically necessary.

15. Between January 1, 2006 and the end of June 2006, defendant KAREN KAGRAMANIAN, who was not licensed in California as a Medical Doctor or as a Physician's Assistant, improperly performed NCV tests on patients at the clinic.

1    16.  Between January 1, 2006 and the end of June 2006, defendant KAREN KAGRAMANIAN instructed others at the clinic to prescribe and perform and did himself perform NCV tests on patients knowing that they these tests were not medically necessary.

    17.  Between January 1, 2006 and the end of June 2006, defendants DANIEL BAIANDOURIAN and KAREN KAGRAMANIAN provided medical files to a third party billing service, 21st Century Medical Billing, that was to perform the ministerial service of preparing and submitting the electronic billings to the Medicare program from information provided by the clinic.

All in violation of Title 18, United States Code, Section 1349.

### Counts 2-14
### Health Care Fraud
### (18 U.S.C. §§ 1347 and 2)

20.  Paragraphs 1 through 15 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

21.  From the summer of 2005 and continuing through in or around June 2006, within the Southern District of California, and elsewhere, defendants KAREN KAGRAMANIAN, DANIEL BAIANDOURIAN, STANLEY SIOZON GARRIDO and CORAZON FERRER, and others known and unknown to the grand jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and wilfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, namely Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program, namely Medicare, in connection with the delivery of and payment for health care benefits, items and services; in

violation of Title 18, United States Code, Section 1347, and Title 18, United States Code, Sec. 2.

### PURPOSE OF THE SCHEME AND ARTIFICE

22. It was the purpose of the scheme and artifice for the defendants and their co-conspirators to unlawfully enrich themselves through the submission of false and fraudulent Medicare claims for medically unnecessary, and non-rendered, tests and treatments.

### THE SCHEME AND ARTIFICE

23. Paragraphs 19.a. through 19.m. of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### ACTS AND ATTEMPTED ACTS IN EXECUTION OF THE SCHEME AND ARTIFICE

24. On or about the dates set forth below, within the Southern District of California and elsewhere, defendants and others known and unknown to the grand jury, for the purpose of executing and attempting to execute the scheme to defraud described above, knowingly and willfully submitted and caused to be submitted to Medicare the following false and fraudulent claims:

| COUNT | MEDICARE BENEFICIARY | DOS[1] | AMT BILLED | CLAIM NUMBER/ CLAIMED SERVICES |
|---|---|---|---|---|
| 2 | JR | 2/10/06 | $210 | 551106094397870/ Physical Therapy |
| 3 | JR | 2/10/06 | $925 | 551806055432180/ Echocardiography Duplex Scan Abdominal Ultrasound |
| 4 | LCA | 2/14/06 | $210 | 551106094398950/ Physical Therapy |
| 5 | LCA | 2/14/06 | $80 | 551806055432480/ Electrocardiogram |

---

[1] "DOS" is date of service.

| COUNT | MEDICARE BENEFICIARY | DOS[2] | AMT BILLED | CLAIM NUMBER/ CLAIMED SERVICES |
|---|---|---|---|---|
| 6 | LN | 3/1/06 | $140 | 551106061395170/ Transrectal Ultrasound |
| 7 | LN | 4/4/06 | $770 | 551806096274310/ Nerve Conduction |
| 8 | LN | 4/17/06 | $260 | 551106128084010/ Physical Therapy |
| 9 | JSL | 3/1/06 | $210 | 551106061395200/ Physical Therapy |
| 10 | JSL | 6/13/06 | $260 | 551106165369600/ Physical Therapy |
| 11 | AM | 4/4/06 | $770 | 551806096274500/ Nerve Conduction |
| 12 | AM | 4/24/06 | $260 | 551106115347040/ Physical Therapy |
| 13 | RA | 4/18/06 | $210 | 551806109216490/ Physical Therapy |
| 14 | RA | 4/20/06 | $210 | 551806111192200/ Physical Therapy |

### Counts 15 -17
### Kickbacks
### (42 U.S.C. § 1320a-7b(b)(2)(A))

25. Paragraphs 1 through 15 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

26. On or about the dates described below, within the Southern District of California, defendants DANIEL BAIANDOURIAN and CORAZON FERRER did knowingly and wilfully offer and pay remuneration directly and indirectly, overtly and covertly, in cash and in kind to induce the referral of patients to the storefront clinic located at 5700 El Cajon Boulevard in San Diego, California for the furnishing and arranging for the furnishing of services and items for which payment may be made in whole and in part under a Federal health care

---

[2]"DOS" is date of service.

program, namely the Medicare program; in violation of Title 42, United States Code, Sec. 1320a-7b(b)(2)(A), and Title 18, United States Code, Section 2:

| COUNT | DATE | DEFENDANT (Payor) | PAYEE | AMT | CIRCUMSTANCES |
|---|---|---|---|---|---|
| 15 | 2/2006 | Corazon Ferrer | AL | $200 | Paid in bathroom |
| 16 | 2/2006 | Corazon Ferrer | YT | $240 | Paid for bringing friends to clinic |
| 17 | Early 2006 | Daniel Baiandourian | DR | $300 | Envelope in vehicle |

## CRIMINAL FORFEITURE
## (18 U.S.C. § 982(a)(7))

27. The allegations contained in Counts 1 through 17 are realleged and incorporated herein by reference as though set forth in full for the purpose of charging criminal forfeiture pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

28. As a result of the commission of the foregoing offenses alleged in Counts 1 through 4 of this Indictment, defendants shall forfeit to the United States any and all property, real and personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of those offenses.

29. In the event that any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses described in Counts 1 through 17 of this Indictment, as a result of any act or omission of the defendants:

    (1) cannot be located upon the exercise of due diligence;

    (2) has been transferred or sold to, or deposited with, third parties;

    (3) has been placed beyond the jurisdiction of the courts;

    (4) has been substantially diminished in value; or

    (5) has been co-mingled with other property which cannot be divided without difficulty;

1  the United States of America shall be entitled to forfeiture of
2  substitute property pursuant to Title 21, United States Code,
3  Sec. 853(p), as incorporated by Title 18, United States Code,
4  Section 982(b)(1) and Title 28, United States Code, Section 2461(c).
5  All in violation of Title 18, United States Code, Sec. 982(a)(7) and
6  Title 28, United States Code, Section 2461(c).
7      DATED: July 9, 2010.

A TRUE BILL:

_____
Foreperson

LAURA E. DUFFY
United States Attorney

By: _____
LAWRENCE A. CASPER
Assistant U.S. Attorney

By: _____
W. MARK CONOVER
Assistant U.S. Attorney